In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00449-CV**
_____

**TAYLOR CARTER, Appellant**

**V.**

**JOSEPH N. PHAM, Appellee**

On Appeal from the 172nd District Court
Jefferson County, Texas
Trial Cause No. E-198,936

**MEMORANDUM OPINION**

Appellant Taylor Carter sued appellee Joseph N. Pham for injuries she allegedly sustained in an automobile accident. The jury found that both Carter and Pham were negligent, assigned fifty percent of fault to each, and awarded Carter zero damages. In her sole issue on appeal, Carter contends that the jury's finding of zero damages was against the great weight and preponderance of the evidence. We affirm the trial court's judgment.

## THE EVIDENCE

Officer Lam Nguyen of the Port Arthur Police Department testified that on April 17, 2015, he investigated a "three-car pileup[,]" spoke with the drivers who were involved, and prepared an accident report. Nguyen explained that based on his investigation, he determined that the first driver, Jessica Espinoza, stopped on the freeway because there were aluminum cans in the roadway, which caused Carter to stop and Pham to rear-end Carter. Nguyen explained that when he initially checked to see if Carter was hurt she appeared to be "kind of shook up[,]" and Carter replied, "I don't know. I'm not sure. I think I'm hurt." According to Nguyen, Carter told him that "she was nervous and she stopped and then she got slammed[,]" and Pham stated that "he couldn't stop and slammed into [th]em." Nguyen testified that Carter reported that she was at a dead stop when the impact occurred, and based on the damage to the vehicles, Nguyen determined that it was a "minor accident," and that Carter was completely stationary when the impact occurred.

Nguyen testified that he was unaware that Carter's medical records from the emergency room indicated that Carter reported that she was traveling fifty miles per hour when she hit the vehicle in front of her. On cross-examination, Nguyen agreed that his accident report indicated that Pham hit Carter's vehicle as she was slowing down and not when she was at a complete stop, and that the impact pushed Carter's vehicle into Espinoza's vehicle, causing minor damages. Nguyen explained that

based on a damage rating of one to six, Espinoza had a back damage rating of one; Carter had no damage rating for the front and a back damage rating of one; and Pham had a front damage rating of two.

Pham testified that he was driving fifty miles per hour before he slowed down when he saw the cans in the roadway and Carter's brake lights, but he ran into the back of Carter's vehicle because he "couldn't stop in time." Pham explained that he stepped on his brake as soon as he saw Carter's brake lights. According to Pham, he was not tailgating, and he did not anticipate that someone would stop in the middle of the freeway because of the aluminum cans. Pham explained that once he saw Carter's brake lights come on, her vehicle stopped almost instantly. Pham testified that he did not know what happened with the vehicles in front of him, but if Carter's statement that she hit the vehicle in front of her was true, his stopping distance would have been shortened. While Pham testified that he ran into the back of Carter's vehicle because he did not have time to stop, he also testified that he was not negligent or careless. Pham denied that he caused Carter to run into the vehicle in front of her. Pham explained that after the accident his "neck had a little ache, bruising[,]" and he went to the hospital by ambulance to make sure everything was okay. Pham testified that other than getting checked out at the hospital, he did not seek any treatment because the pain went away.

Keli Lanclos, a nurse practitioner, testified by video deposition. Lanclos testified she is Carter's medical provider, and that Carter came to see her on April 23, 2015, to follow up on her emergency room visit after the accident. Lanclos's medical records from the April 23 visit indicate that Carter reported that "she was rear-ended, causing her to hit the car in front of her[,]" and also reported that her airbags did not deploy. Lanclos explained that Carter reported that her neck was hurting, and Lanclos performed a physical exam which showed that Carter had stiffness and a decreased range of motion. Lanclos testified that she reviewed the cervical x-ray from the emergency room and ordered a cervical MRI, which showed that Carter had a bulging disc at C5-C6 and some straightening of the neck, which indicates muscle spasm. According to Lanclos, the straightening of the neck is like a whiplash injury. Lanclos testified that she gave Carter a cortisone shot, an anti-inflammatory, a muscle relaxer, and some pain pills. Lanclos also prescribed physical therapy and referred Carter to Dr. Craig Charleston for pain management, which included epidural injections.

Lanclos testified that after Carter received pain management, she returned in July of 2017, complaining that she was still having neck pain on her right side, and she requested a cortisone shot. Lanclos explained that Carter also reported having anxiety problems, which she had experienced before the accident. Lanclos testified that Carter returned in November and December of 2017 with neck pain. According

4

to Lanclos, Carter's neck pain was chronic, and because Carter never complained about her neck prior to the accident, Lanclos opined that the accident caused Carter's neck problems.

On cross-examination, Lanclos testified that prior to the accident, Carter had problems related to chronic headaches. Lanclos explained that during the April 2015 visit, she diagnosed Carter with a cervical strain injury, which usually resolves in approximately eight weeks. Lanclos testified that Carter did not report any history of a head injury during the initial visit, and Carter waited almost two months to get the MRI Lanclos had referred. Lanclos testified that the MRI showed a very small disc bulge of approximately two millimeters at the C5-C6 level and that there was no significant spinal canal stenosis or cord contact. Lanclos explained that the MRI showed that there was no impingement of any nerves or the spinal cord. Lanclos also testified that the MRI showed straightening of the lordosis, which is commonly associated with muscle spasm, and Lanclos explained that the straightening tends to go away within four to eight weeks. According to Lanclos, Carter requested a referral for physical therapy after she got the MRI, and in July, Carter requested refills for the narcotic pain reliever and muscle relaxer.

Lanclos testified that the next time she saw Carter was for head and nasal congestion in March 2016, and Carter's neck exam was normal and she had no complaints about her neck at that time. In June 2016, Carter had her annual

5

examination, during which Carter only complained of headaches, and Lanclos noted that Carter's neck was "supple, full range of motion, no complaints." Lanclos explained that when she saw Carter in September 2016, Carter complained about testing anxiety at college, but Carter did not complain about her neck, which was supple with a full range of motion. According to Lanclos, Carter's neck exam was normal, and she did not see anything indicating that Carter was having any ongoing problems from the accident.

Lanclos testified that the first time Carter requested pain management after the accident was in November 2016, when Carter called and requested a referral to Dr. Charleston. Lanclos explained that Carter reported that she "continues with neck pain on and off since her MVA, about a year and a half ago[,]" and Lanclos testified that she asked to see Carter in the office, because she was presenting a different history than she had given Lanclos over the past year and a half. Lanclos testified that during the November 2016 office visit, Carter reported that she had physical therapy, her pain was increasing, and she was having some flare-ups, but Carter did not give a history about any constant problem. Lanclos's exam showed neck tightness with range of motion, pain in the back of the neck, tender to palpation, but the pain did not radiate in the arms. According to Lanclos, the first time she had made this finding regarding the accident was in November 2016, and Lanclos prescribed Carter Tylenol 3 and a muscle relaxer. Lanclos testified that Carter did

6

not complain about neck pain during her visit in January 2017, during which her exam showed that her neck was supple with a full range of motion, but Carter was taking an antidepressant, pain medicine, and a muscle relaxer. According to Lanclos, Carter did not complain about neck pain during her visits in August and September of 2017, and her neck exams were normal.

Lanclos testified that in November 2017, Carter presented with complaints of neck pain, which she reported had lasted for the past two days, and Carter requested a steroid shot but did not relate the neck pain to the accident. Lanclos explained that Carter's neck exam showed no abnormalities. Lanclos testified that during Carter's last visit in December 2017, Carter complained about some tenderness with palpation, but the neck exam showed no palpable abnormality. According to Lanclos, Carter reported that Dr. Charleston had given her a couple of injections and advised her to take over-the-counter Ibuprofen. Lanclos explained that she had just seen Carter the month before and she wondered "[w]hy am I seeing her again for this[,]" and "what's going on with this?" Lanclos testified that she could not say with reasonable medical probability that any of the neck complaints that Carter presented with a year and half after the accident were related to the accident. Lanclos further testified that because some people who have a disc bulge of two millimeters or less have no history of trauma, she could not say that the MRI finding was related to the accident. According to Lanclos, Carter's MRI shows that she has a bone spur at the

7

C5 level, and bone spurs do not appear in two or three weeks after an accident. Lanclos opined that Carter's MRI showed a neck spasm which indicated that she had whiplash, which was good news because whiplash goes away.

Charleston, a pain management specialist, testified by video deposition. Charleston testified that when he first evaluated Carter in November 2016, she presented with complaints of neck and bilateral shoulder pain for approximately eighteen months. Charleston testified that the finding from Carter's November 2016 MRI showed that "it was a C5-6 disc desiccation, bulging disc, with uncinate prominence greater on the right, causing some minimal mass effect on the anterior thecal sac." According to Charleston, it was a "mild bulging disc" that was pushing on the covering around the spinal cord and showing some signs of drying out, which could cause pain. Charleston diagnosed Carter with cervical disc displacement and cervical radiculopathy, and Charleston determined that Carter had a positive Hoffman's sign in the left upper extremity, which means she had some spinal cord irritation or "central nervous system/brain/spinal cord irritation." Charleston explained that Carter had pain to palpations at C5-C6 bilaterally, uneven reflexes, and "weakness on the left side in certain nerve distributions from the cervical spine, C5, C6, C7, and C8[.]" According to Charleston, the weakness and pain were going down Carter's shoulders and into her arms.

8

Charleston testified that in November 2016, he gave Carter cervical epidural steroid injections to flood the area at C5-C6 to relieve the pain and "return the nerve back to its normal function[.]" According to Charleston, Carter returned in January 2017, complaining of sleeping problems and "stabbing, throbbing, aching, constant pain . . . [and] radiation into the shoulders[,]" and he gave Carter a second injection in June 2017. Charleston testified that when he next saw Carter in January of 2018, she had improved, but he gave Carter a third injection because she presented with pain in the neck, arm, both sides, and still had the Hoffman's sign on the left. Charleston testified that Carter has chronic pain and that based on reasonable medical probability, the April 2015 accident caused Carter's condition and pain, and he explained that because Carter has a greater likelihood of chronic pain in the future, she will require medical treatment from a pain doctor.

On cross-examination, Charleston agreed that he did not see Carter until a year and a half after the accident and that the June 2015 MRI, which was done a couple of months after the accident, did not state there was disc desiccation at C5-C6 or show any evidence of nerve impingement on the spinal canal of the foramina. Charleston also agreed that the radiologist who compared Carter's June 2015 MRI with her November 2016 MRI determined that there was no change in the condition between the two studies, and that there was still no evidence of any nerve impingement. Charleston testified that there is no objective evidence showing that

9

Carter was diagnosed with any radiculopathy before she saw him, and there were no objective studies confirming or disputing the presentation of the radicular component. According to Charleston, he has not seen Carter over the past year and does not have any knowledge regarding her current condition, but he is "assuming she's better."

Carter testified that she was driving home when she saw a "bunch of cans[]" in the roadway, which caused the car in front of her to slow and come to a stop. Carter testified that she slowed down and came to a stop without hitting the car in front of her, but the car behind her hit her, pushing her forward into the car in front of her. Carter explained that the impact was "not really[]" hard, and she was not hurt right away. According to Carter, she hit her head on the back of the seat "three or four times once he had hit me from behind[,]" which caused her to have a headache. Carter testified that she went to the hospital by ambulance and reported that she "impacted another vehicle, rear bumper, when her own rear bumper was impacted by another vehicle[,]" had a slight headache but was otherwise uninjured, and she denied any secondary impact involving the head. Carter agreed that at the hospital she reported that she was "rear-ended, causing her to hit the car in front of her." Carter testified that she was diagnosed with a cervical sprain, prescribed pain medication and muscle relaxants, and advised to follow up with her primary care physician.

Carter explained that she followed up with Lanclos because she was having pain toward the bottom of her neck, and Lanclos prescribed her tramadol, a narcotic, and a muscle relaxant. According to Carter, she still takes tramadol two to three times per month because her pain "comes and goes." Carter explained that she did not complain about back pain during some of her visits with Lanclos because she was taking tramadol. Carter explained that she has been diagnosed with a bulging disc, and Dr. Patil, an orthopedic surgeon, advised her that it will get worse over time and require her to undergo surgery. Carter testified that her pain caused her to miss work on a few occasions and prevented her from efficiently performing her job duties. According to Carter, she takes medication and tries to work through her pain when she has flare-ups. Carter testified that due to her pain, she can no longer play with her nephews, lift weights, or exercise like she did before the accident.

On cross-examination, Carter testified that the driver in front of her slowed and gradually came to a stop, and Carter "stopped quicker than you normally would stop." Carter explained that she did not put her foot all the way down on the pedal. According to Carter, she was completely stopped when Pham hit her. Carter agreed that in her sworn interrogatories she stated that traffic was slowing when Pham hit her, and she did not state that she came to a stop. Carter also agreed that during her deposition, she testified that the driver in front of her slowed and then hit her brakes and abruptly stopped, which forced Carter to slam on her brakes. Carter testified that

11

while in the ambulance, she reported that she was in a three-car pileup and that she was driving fifty miles per hour. Carter further testified that at the hospital, she "[p]ossibly[]" reported that she tried to slow and couldn't and hit the car in front of her[,]" but Carter explained at trial that "maybe they misunderstood" because she "didn't hit the car in front of me until the car behind me hit me." Carter agreed that she had provided four different versions of how the accident happened.

While Carter testified that after the accident she was off work for a week and had to work fewer hours because of her injuries, Carter agreed that her employment records showed that she worked more hours after the accident "[p]ossibly[]" because she was out of school for the summer. Carter did not remember testifying at her deposition that the accident caused her to drop out of college, and she agreed that she finished the spring and fall semesters after the accident and had since graduated. According to Carter, she "took a semester off, but I don't remember exactly when that semester was[,]" because "I needed a break." Carter testified that her doctors never said that she could not go to school or work because of the accident.

Carter testified that she saw Lanclos a week after the accident and was prescribed tramadol for her pain, which she only took as needed. Carter agreed that Lanclos prescribed her a ten-day supply of tramadol in April 2015, totaling thirty pills, and an additional thirty pills in July 2015, and that Lanclos did not prescribe her any painkillers until almost a year and a half later. Carter testified that she was

12

taking tramadol when she saw Lanclos over the year and a half period when she did not complain about her neck pain. According to Carter, she had constant neck pain during 2015, 2016, and 2017.

Carter testified that after she had her MRI, she went to physical therapy for eight weeks. Carter explained that she went to see a specialist in Houston and was advised that she had a minor disc bulge and that there was no evidence of any impingement on her nerves or spinal cord. Carter testified that when she saw Lanclos about a month later, she did not complain about her neck pain when Lanclos examined her neck. According to Carter, she always has neck pain, and she did not complain to Lanclos in June 2016 because she thought Lanclos knew of her injury and "knew that I was in pain no matter what." Carter testified that she has always had anxiety problems, and in September 2016, her anxiety was caused by nursing school and was not related to the accident. Carter also explained that prior to the accident, she had daily headaches and was taking prescription medication, and Carter claimed that her headaches had worsened since the accident.

Sharon Carter, Carter's mother, testified that before the accident Carter worked in the infant room at their family daycare business. Sharon testified that Carter was off work for a week after the accident, and Carter continued to have pain off and on after the accident. According to Sharon, she transferred Carter to the pre-K classroom, because Carter was unable to lift the babies in the infant room and

perform other duties after the accident. Sharon testified that there also were times when Carter's pain required her to take off from school. Sharon explained that she paid Carter a regular paycheck even we she used sick time.

Sharon testified that before Carter saw Charleston, she took Carter to see Dr. Patil, a spine surgeon, for a second opinion concerning her pain. Sharon explained that Patil opined that Carter had a bulging disc and would continue to have problems in the future which could possibly require surgery. Sharon testified that Patil offered fusion surgery, but Carter declined. Sharon also testified that she suggested that Carter see Charleston for her pain, because Charleston had helped Sharon by performing three back surgeries and giving her multiple injections. According to Sharon, Carter still had pain after receiving her first injection, and Charleston gave her a total of three injections. Sharon testified that Carter's activity has been curtailed since the accident, and when Carter is in pain, she is unable to do the things she used to do.

The jury found that Carter and Pham were each fifty percent negligent in causing the accident and awarded Carter zero damages for the reasonable cost of past and future medical care; lost wages; physical pain, suffering, and mental anguish sustained in the past and that, in reasonable probability, will be sustained in the future; and physical impairment sustained in the past and that, in reasonable probability, will be sustained in the future. Carter filed a motion for new trial,

14

arguing that there was insufficient evidence to support the jury's negligence finding against her and that the jury should have awarded her some money damages because the collision between her and Pham caused enough impact to cause her injuries. Pham argued that the evidence showed that there were two impacts and that Carter failed to prove that her injuries resulted from her impact with Pham. The trial court denied Carter's motion for new trial.

## ANALYSIS

In her sole issue, Carter argues that the jury's finding of zero damages was against the great weight and preponderance of the evidence. According to Carter, because objective medical evidence shows that she suffered at least some compensable injury because of the accident, the evidence is factually insufficient to support the jury's finding of zero damages.

Generally, a jury has great discretion in considering evidence concerning the issue of damages. *Rumzek v. Lucchesi*, 543 S.W.3d 327, 331 (Tex. App.—El Paso 2017, pet. denied). We may overturn a jury's findings on damages if the evidence supporting its findings is so weak or the jury's findings are so contrary to the great weight and preponderance of the evidence that they are clearly unjust. *Id.*; *see Dow Chem Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). In reviewing a complaint that the jury's failure to make a finding of damages is against the great weight and preponderance of the evidence, we consider and weigh all the evidence, keeping in

15

mind that the factfinder is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and may choose to believe one witness and disbelieve another. *Rumzek*, 543 S.W.3d at 332; *see Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). As factfinder, the jury is free to disbelieve expert witnesses. *Waltrip v. Bilbon Corp.*, 38 S.W.3d 873, 882 (Tex. App.—Beaumont 2001, pet. denied). "[O]pinion testimony, even when uncontroverted, does not necessarily bind the jury." *Id.*

> [T]he judgments and inferences of experts or skilled witnesses, even when uncontroverted, are not conclusive on the jury or trier of fact, unless the subject is one for experts or skilled witnesses alone, where the jury or court cannot properly be assumed to have or be able to form correct opinions of their own based upon evidence as a whole and aided by their own experience and knowledge of the subject of inquiry.

*McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986).

In resolving Carter's complaint about the jury's failure to award damages, we note that there is a difference between cases in which a plaintiff has presented uncontroverted "objective" evidence of an injury caused by a defendant's negligence and cases in which the plaintiff complains about injuries that are more "subjective" in nature. *See Rumzek*, 543 S.W.3d at 332. When there is uncontroverted evidence of an objective injury, a jury finding that the plaintiff suffered no damages is against the great weight and preponderance of the evidence, especially when the jury finds a causal connection between the defendant's negligence and the plaintiff's injuries. *See Hammett v. Zimmerman*, 804 S.W.2d 663, 664 (Tex. App.—Fort Worth 1991,

16

no writ). However, a jury may deny damages if the plaintiff's injuries are more "subjective" in nature. *See Rumzek*, 543 S.W.3d at 333; *Hammett*, 804 S.W.2d at 665.

The presence or absence of physical pain is inherently subjective to the individual, and the jury is free to disbelieve both experts and lay witnesses who testified regarding a plaintiff's pain. *Waltrip*, 38 S.W.3d at 881-82. Appellate courts are more likely to overturn jury findings of no damages when there is more evidence of outward signs of pain because the findings are less likely to depend upon the plaintiff's own feelings and complaints. *Blizzard v. Nationwide Mut. Fire Ins. Co.*, 756 S.W.2d 801, 805 (Tex. App.—Dallas 1988, no writ). While a muscle spasm is an objective symptom, a jury can disregard an objective symptom if it was not discovered until several weeks after the accident, especially if reports of other examining physicians indicated no objective symptoms were present. *See McGuffin v. Terrell*, 732 S.W.2d 425, 427 (Tex. App.—Fort Worth 1987, no writ).

The record shows that after the accident, Carter provided conflicting accounts regarding how the accident occurred and the extent of her injuries. Carter testified that her head struck the headrest three or four times when Pham hit her from behind, causing her to have a headache, but Carter also reported that she was not injured and denied any secondary impacts in the ambulance and the emergency room. The jury heard that Carter did not report that she hit her head during her initial visit with

17

Lanclos, and that Carter waited almost two months to get the MRI that Lanclos ordered, which Lanclos testified showed a muscle spasm. The jury also considered Lanclos's testimony that the MRI showed that there was no impingement of any nerves or the spinal cord, and that Lanclos could not say that the small bulging disc was related to the accident. Instead, Lanclos opined that Carter had a bone spur at the C5 level, which would not have developed in a few weeks after the accident.

Additionally, the jury heard that Carter did not see Charleston until eighteen months after the accident, and Lanclos testified that she could not say that any of the neck complaints that Carter presented with a year and half later were related to the accident. The jury heard that Charleston diagnosed Carter with cervical disc displacement and cervical radiculopathy, but Charleston also testified that the June 2015 MRI did not show a disc desiccation at C5-C6 or any evidence of nerve impingement on the spinal canal of the foramina. Additionally, the jury considered Charleston's testimony that there was no evidence of any nerve impingement in the November 2016 MRI, and that there was no objective evidence showing that Carter was diagnosed with any radiculopathy before she saw him or any objective studies confirming or disputing the presentation of the radicular component.

Since the first evidence of an objective injury was not documented until almost two months after the accident and because Lanclos could not say that the MRI finding was related to the accident, the jury may not have believed that Carter's

18

muscle spasm and small bulging disc resulted from the accident with Pham. *See McGuffin*, 732 S.W.2d at 427; *Hyler v. Boytor*, 823 S.W.2d 425, 427-28 (Tex. App.—Houston [1st Dist.] 1992, no writ). It was within the province of the jury to resolve conflicts in the evidence, to weigh the evidence, and to draw inferences from basic facts to ultimate facts. *See Rumzek*, 543 S.W.3d at 332; *see also Waltrip*, 38 S.W.3d at 882. Because the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony, it was free to accept or reject all or part of the witnesses' testimony and the evidence. *See McGalliard*, 722 S.W.2d at 697; *Waltrip*, 38 S.W.3d at 882. Therefore, we cannot say that the jury's failure to award Carter damages was so contrary to the great weight and preponderance of the evidence to be manifestly unjust. Considering and weighing all the evidence, we conclude that the evidence supporting the jury's finding of zero damages is not so weak nor is the jury's finding so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. Moreover, because the jury's findings are not manifestly unjust, the trial court did not abuse its discretion by overruling Carter's motion for new trial. *See Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). We overrule Carter's sole issue and affirm the trial court's judgment.

AFFIRMED.

_____
W. SCOTT GOLEMON
Chief Justice

Submitted on February 22, 2021
Opinion Delivered May 6, 2021

Before Golemon, C.J., Kreger and Horton, JJ.